**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERALD CARLIN, JOHN RAHM, PAUL ROZWADOWSKI, and BRYAN WOLFE, *Plaintiffs-Appellants*, <br><br> v. <br><br> DAIRYAMERICA, INC. and CALIFORNIA DAIRIES, INC., *Defendants-Appellees*. | No. 10-16448 <br><br> D.C. No. 1:09-CV-00430-AWI-DLB <br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted
August 31, 2011—San Francisco, California

Filed August 7, 2012
Amended January 11, 2013

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and George H. Wu, District Judge.[*]

Order;
Opinion by Judge Wu;
Concurrence by Judge Fisher

---

[*] The Honorable George H. Wu, United States District Judge for the Central District of California, sitting by designation.

# SUMMARY[**]

### Filed Rate Doctrine / Class Action

The panel issued a published order, amending the opinion filed August 7, 2012, and published at 688 F.3d 1177, with the only change that Judge Fisher concurs in the judgment, rather than joins the majority opinion.

The panel reversed the district court's Fed. R. Civ. P. 12(b)(6) dismissal of consolidated class actions brought by plaintiffs, who are non-California dairy farmers, against California dairy cooperatives. In an issue of first impression, the panel held that the district court properly determined that the filed rate doctrine applied to the Agricultural Marketing Agreement Act of 1937 minimum milk pricing program. Specifically, the panel held that the judicially created filed rate doctrine, which typically has been utilized in common carrier and public utility litigation, is applicable in a class action lawsuit seeking monetary and injunctive relief under state law arising from the misreporting of pricing data to the United States Department of Agriculture, where the data in turn were used to set a minimum price structure for raw milk sales. The panel concluded, however, that the district court erred by concluding that the filed rate doctrine applied to bar the plaintiffs' state-law claims in this case.

Judge Fisher concurred in the judgment, and along with the majority he would vacate the dismissal of the plaintiffs' claims because the filed rate doctrine did not apply to this

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

case. Judge Fisher parted with the majority's conclusion that the plaintiffs have *proven* the USDA's rejection of the Federal Milk Marketing Orders prices, and he would hold only that the plaintiffs have adequately alleged the USDA's rejection of the prices.

## COUNSEL

Benjamin D. Brown (argued), Daniel A. Small, Victoria S. Nugent, George F. Farah, and Brent W. Johnson, Cohen Milstein Sellers & Toll PLLC, Washington, D.C.; Joseph J. Tabacco, Jr., Christopher T. Heffelfinger, and Anthony D. Phillips, Berman DeValerio, San Francisco, California; Ron Kilgard, Keller Rohrback P.L.C., Phoenix, Arizona; Jon A. Tostrud, Case Lombardi and Pettit, Honolulu, Hawaii; Lynn L. Sarko, Mark A. Griffin, Juli E. Farris, Keller Rohrback P.L.C., Seattle, Washington; J. Barton Goplerud, Hudson, Mallaney, Shindler and Anderson, PC, West Des Moines, Iowa, for Plaintiffs-Appellants.

Allison A. Davis, Davis Wright Tremaine LLP, San Francisco, California; Charles M. English (argued), Wendy M. Yoviene and E. John Steren, Ober, Kaler, Grimes & Shriver, Washington, D.C., for Defendant-Appellee DairyAmerica, Inc.

John J. Vlahos (argued), Lawrence M. Cirelli and S. Anne Johnson, Hanson Bridgett LLP, San Francisco, California, for Defendant-Appellee California Dairies, Inc.

**ORDER**

The opinion filed August 7, 2012 and published at 688 F.3d 1117, is amended as follows:

Rather than joining the opinion, Judge Fisher concurs in the judgment.

The amended opinion and separate concurrence by Judge Fisher will be filed concurrently with this order. There are no changes to the text of the majority opinion.

Judge Rawlinson and Judge Wu have voted to deny the petition for rehearing. Judge Rawlinson has voted to deny the petition for rehearing en banc and Judge Wu so recommends. Judge Fisher has voted to grant the petition for rehearing and rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellee DairyAmerica Inc.'s petition for rehearing and rehearing en banc, filed September 20, 2012, and joined in by appellee California Dairies, Inc., on September 21, 2012, is **DENIED**.

No further petitions for rehearing or rehearing en banc may be filed.

**OPINION**

WU, District Judge:

This appeal raises two issues: (1) whether the judicially created "filed rate doctrine,"[1] which typically has been utilized in common carrier and public utility litigation, is applicable in a class action lawsuit seeking monetary and injunctive relief under state law arising from the misreporting of pricing data to the United States Department of Agriculture ("USDA"), where the data in turn were used to set a minimum price structure for raw milk sales; and (2) if the doctrine is applicable in that situation, whether the district court erred when it dismissed the plaintiffs' state causes of action on the ground that the filed rate doctrine barred such claims, even though the court found that "[i]t is not disputed that [the] USDA determined that the rates calculated . . . were erroneous and that other rates should have applied based on corrected pricing inputs."[2]

---

[1] The precept is most often cited as the "filed rate doctrine," although it is sometimes referenced as the "filed tariff doctrine" (*see, e.g.*, *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084 (9th Cir. 2006)), and, on rarer occasions, as the "*Keogh* doctrine" (*see, e.g.*, *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 943 & n.7 (9th Cir. 1996)), after the case where it was purportedly first established (*i.e.*, *Keogh v. Chi. & Nw. Ry. Co.*, 260 U.S. 156 (1922)). As used herein (except where a different term is utilized within a quoted source), the reference will be to the "filed rate doctrine."

[2] The district court's dismissal decision is reported at *Carlin v. DairyAmerica, Inc.*, 690 F. Supp. 2d 1128 (E.D. Cal. 2010).

**BACKGROUND**

## I. Statutory and Regulatory Framework as to Milk Pricing

As observed in *Zuber v. Allen*, 396 U.S. 168, 172-73 (1969):

> The two distinctive and essential phenomena of the milk industry are a basic two-price structure that permits a higher return for the same product, depending on its ultimate use, and the cyclical characteristic of production.
>
> Milk has essentially two end uses: as a fluid staple of daily consumer diet, and as an ingredient in manufactured dairy products such as butter and cheese. Milk used in the consumer market has traditionally commanded a premium price, even though it is of no higher quality than milk used for manufacture. While cost differences account for part of the discrepancy in price, they do not explain the entire gap. At the same time the milk industry is characterized by periods of seasonal overproduction. The winter months are low in yield and conversely the summer months are fertile. In order to meet fluid demand which is relatively constant, sufficiently large herds must be maintained to supply winter needs. The result is oversupply in the more fruitful months. The historical tendency prior to regulation was for milk

distributors, "handlers," to take advantage of this surplus to obtain bargains during glut periods. Milk can be obtained from distant sources and handlers can afford to absorb transportation costs and still pay more to outlying farmers whose traditional outlet is the manufacturing market. [Footnote omitted.] To maintain income[,] farmers increase production and the disequilibrium snowballs.

Congress passed the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. § 601 *et seq*.) ("AMAA") "in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 461 (1997). Section 8c of the AMAA (7 U.S.C. § 608c) authorizes the Secretary of Agriculture to issue "orders" applicable to "handlers" who receive, process, package, or redistribute milk or milk products.[3] "Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets . . . ." *Glickman*, 521 U.S. at 461. As stated in *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984), "[t]he 'essential purpose [of this milk market order scheme is] to raise producer prices,' S. Rep. No. 1011, 74th Cong., 1st Sess., 3 (1935), and thereby to ensure that the benefits and burdens of the milk market are fairly and proportionally shared by all dairy farmers." *Id.* at 342 (second alteration in original); *see also Ark. Dairy Coop. Ass'n, v. U.S. Dep't of Agric.*, 573 F.3d 815, 818 (D.C. Cir. 2009).

---

[3] In the context of milk and milk products, "handler" is defined in 7 C.F.R. § 1000.9 (2012).

Milk, milk products, and prices paid by handlers to producers of raw milk (*i.e.*, dairy farmers) are regulated by what are commonly referred to as Federal Milk Marketing Orders ("FMMOs") issued by the USDA pursuant to section 8c(5) of the AMAA. 7 U.S.C. § 608c(5). The promulgation process is described in *Block* as follows:

> Under the scheme established by Congress, the Secretary must conduct an appropriate rulemaking proceeding before issuing a milk market order. The public must be notified of these proceedings and provided an opportunity for public hearing and comment. See 7 U. S. C. § 608c(3). An order may be issued only if the evidence adduced at the hearing shows "that [it] will tend to effectuate the declared policy of this chapter with respect to such commodity." 7 U. S. C. § 608c(4). Moreover, before any market order may become effective, it must be approved by the handlers of at least 50% of the volume of milk covered by the proposed order and at least two-thirds of the affected dairy producers in the region. 7 U. S. C. §§ 608c(8), 608c(5)(B)(i). If the handlers withhold their consent, the Secretary may nevertheless impose the order. But the Secretary's power to do so is conditioned upon at least two-thirds of the producers consenting to its promulgation and upon his making an administrative determination that the order is

> "the only practical means of advancing the interests of the producers." 7 U. S. C. § 608c(9)(B).

467 U.S. at 342 (alteration in original).

Section 8c(5) of the AMAA requires that the FMMOs contain provisions which, *inter alia*: (1) classify milk in accordance with the purpose for which it is used, (2) set minimum prices for each such use that handlers must pay, (3) require that said prices be uniform except that adjustments can be made for production differentials, grade or quality of the milk, and locations of delivery, and (4) provide for the use of "blended" prices such that all producers of milk subject to a particular FMMO receive a uniform price for the milk delivered to handlers regardless of the ultimate use of the milk. 7 U.S.C. § 608c(5). The AMAA (and hence each FMMO) only requires a *minimum* price. As observed in *Farmer Union Milk Mktg. Coop. v. Yeutter*, 930 F.2d 466, 468-69 (6th Cir. 1991):

> Although the AMAA mandates a minimum price, it does not mandate a maximum price. Handlers cannot pay less than the blend price, but they are allowed to pay as much as they want. In times of relative scarcity, handlers can and do negotiate premiums, known as "over-order" prices, for the sale of the milk. These premiums are most typically paid for milk that is intended for Class I use, but they can apply to any of the three classes. Thus, market forces are allowed to intrude on this regime on occasion, though only in one direction.

FMMOs have been issued which cover some, but not all, regions of the United States.[4] *See* 7 C.F.R. pts. 1001, 1005-07, 1030, 1032-33, 1124, 1126, 1131, 1135 (2012) (setting price regulations for each designated region).

The Secretary of Agriculture has delegated his authority under the AMAA to the Under Secretary for Marketing and Regulatory Programs, *see* 7 C.F.R. § 2.22(a)(1)(viii)(G) (2011), and, in turn, the Under Secretary has delegated it to the Administrator for the Agricultural Marketing Service ("AMS"). 7 C.F.R. § 2.79(a)(8)(viii) (2011); *see also White Eagle Coop. Ass'n v. Connor*, 553 F.3d 467, 482 (7th Cir. 2009). As to each operative FMMO, there is a "market administrator" selected by the Secretary who is empowered, *inter alia*, to: (1) "[a]dminister the order in accordance with its terms and provisions"; (2) "[m]ake rules and regulations to effectuate the terms and provisions of the order"; (3) "[r]eceive, investigate, and report complaints of violations to the Secretary"; and (4) announce FMMO prices on designated days of each month. 7 C.F.R. §§ 1000.25(b), 1000.53 (2012).

The district court correctly observed that "[t]he method by which [the USDA has] accomplished [the framework for a minimum price structure for milk and milk products] is admittedly complex." 690 F. Supp. 2d at 1130. A description of part of that methodology is provided in *Ark. Dairy Coop. Ass'n*, 573 F.3d at 818–19, as follows:

> The AMAA and its implementing regulations use two regulatory mechanisms: price fixing and payment pooling. The

---

[4] For example, there is no FMMO covering the state of California. *See Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 61 (2003).

minimum prices that handlers must pay vary according to the end use of the milk, as categorized in four classes. *See* 7 U.S.C. § 608c(5)(A); 7 C.F.R. § 1000.40 (Class I milk is sold in fluid form, Class II milk is used to make ice cream, soft cheeses, and related products, Class III milk is used to produce harder cheeses, and Class IV milk is used to make butter and related products [including nonfat dry milk products].). Instead of setting specific prices to be paid for each Class, the Secretary has established a formula by which the price for each Class is determined monthly based on the average nationwide wholesale prices from the previous month. *See* 7 C.F.R. § 1000.50; *Milk in the Northeast and Other Marketing Areas; Notice of Proposed Rulemaking and Tentative Partial Final Decision*, 73 Fed. Reg. 35,306, 35,308 (June 20, 2008) ("Tentative Decision"). The formulas for Class III and IV milk are based on the nationwide average prices for butter, nonfat dry milk, cheese, and dry whey, minus a set dollar amount for each of those products, multiplied by a "yield factor." 7 C.F.R. § 1000.50(*l*)-(*o*). Class I and II prices are derived from the Class III and IV prices but Class I prices are adjusted for the location of the handler so that handlers pay different prices in different geographic areas. *See* 7 C.F.R. §§ 1000.50, 1000.52. The amounts subtracted from the average sale prices of Class III and IV products, known in the milk industry as "make allowances" or

"manufacturing allowances," are intended to represent the costs to the handlers of making the end dairy products from raw milk. *Tentative Decision*, 73 Fed. Reg. at 35,308. In essence, handlers retain from the average wholesale price the amount set by the make allowance and transfer the balance to producers.

The second major component of dairy market regulation is payment pooling. Under this system, handlers pay prices according to the end use of milk, but all the producers in a geographic area receive the same monthly average or "blended" price per unit of milk sold, regardless of the use to which their milk is put. *See* 7 U.S.C. § 608c(5)(B); 7 C.F.R. §§ 1000.70, 1000.76. This payment equalization is accomplished through the "producer settlement fund" into which handlers pay, or from which handlers withdraw, according to whether their blend-price payments to producers are less or greater than the end-use-value of the milk they have purchased. 7 C.F.R. §§ 1000.70, 1000.76. Again, the effect of this regime is that handlers make payments which vary according to the market value of the milk they use (as reflected in minimum prices), while all producers in an area receive the same average, or blended, price per unit of milk.

Different geographic areas of the United States are regulated under slightly different

conditions, although the formulas used to set prices of Class III and IV milk are the same in all areas. *See* 7 C.F.R. § 1000.50. Each of eleven areas, generally known as a "marketing area" or "milk marketing area," is governed by a different "Order" of the Secretary. *See*, *e.g.*, 7 U.S.C. § 608c(5)(A); 7 C.F.R. § 1001.2.

The process utilized by the AMS during the relevant period here to establish the formulas through which minimum prices were set pursuant to an FMMO is also complicated, but is adequately summarized in *Ark. Dairy Coop., Inc. v. U.S. Dep't of Agric.*, 576 F. Supp. 2d 147, 152 (D.D.C. 2008), *aff'd*, 573 F.3d 815 (D.C. Cir. 2009), as follows:

> Under the FMMOs, a dairy plant pays, and a dairy producer receives, minimum prices in the form of federally established "component prices" for butterfat, protein, solids not fat, and other solids, or skim-fat prices that are derived from those component prices. *See* 7 C.F.R. § 1000.50. There are three factors that are used in the pricing formulas: (1) prices of certain dairy products surveyed by the National Agricultural Statistics Service ("NASS"); (2) a make allowance; and (3) a yield. *See id.* The levels of each of these factors affect the price that plants pay for raw milk and, ultimately, how much producers received for their milk. Adjustments in any of these factors will impact pricing.

The make allowance and the yield are fixed by rule; the product prices are determined weekly by NASS. *See id.* Every Friday morning, NASS reports the prices of certain cheeses, butter, non-fat dry milk, and dry whey. USDA then announces the advanced prices based on the weighted average of two weeks of NASS prices. *Id.* The make allowances represent the allowance for manufacturing raw milk into a finished product. Changes to the make allowance have an inverse relationship to the resulting changes in the minimum prices. Producers benefit from lower make allowances, and manufacturers benefit from higher make allowances. The yield factor represents the amount of a manufactured dairy product that can be produced per hundredweight (100 pounds) of milk. USDA accounts for the portion of the price of milk that is attributable to the costs of the manufacturing process through the make allowance. When the price of manufactured goods is raised, however, USDA recaptures the cost by reporting a higher price for the wholesale product prices to NASS. As a result, any increase in the selling price of manufactured goods used to produce milk will increase the price manufacturers must pay producers for raw milk. *Id.*

The pricing formulas are changed through formal rule-making hearings. *See* 7 C.F.R. §§ 900.3-900.18. After the close of the

evidentiary portion of the hearing, exceptions and comments are filed by interested parties and an administrative law judge certifies the transcript to USDA. *See id.* §§ 900.9-900.10. Dairy Programs, a division of USDA, then prepares and submits a recommendation to USDA.  The recommendation details the findings of fact, rationale, and the legal authority for its decision. *See id.* § 900.12. After Dairy Programs has issued its recommendation, another round of comments follow, and a referendum on the order, as amended, is held.  Producers facing a referendum must choose between voting out the entire marketing order or approving the amended order.  There is no vote on the amendment itself.  If the referendum passes, the order is adopted and becomes a final rule. *See id.* §§ 900.300-311.

To actually set the minimum prices, FMMOs require the collection and input of certain economic information regarding commercial transactions involving milk and milk products. *See*, *e.g.*, 7 C.F.R. § 1000.50 (2012).  Prior to 2000, the USDA's National Agricultural Statistics Service ("NASS") relied on the prices of dairy commodities on established and specified public exchanges, including the Chicago and New York Mercantile Exchanges, in the calculation of FMMO minimum milk prices.  *See*, *e.g.*, 63 Fed. Reg. 35,564 (June 30, 1998).[5]  The Dairy Market

---

[5] *See also* Kenneth Bailey & Peter Tozer, *An Evaluation of Federal Order Reform*, 84 J. Dairy Sci. 974, 977 (2001) (indicating that NASS had been using such exchanges for pricing information but that they were

Enhancement Act of 2000, 7 U.S.C. § 1637 *et seq.*
("DMEA"), was enacted in part to give the USDA the
authority to make the reporting of dairy product information
mandatory.    *See* 72 Fed. Reg. 36,341 (July 3, 2007).
However, the regulations implementing the DMEA (now
codified at 7 C.F.R. Part 1170 (2012)) were not promulgated
until 2008.

The district court summarized NASS's methods for
collecting pricing information during the period of time
relevant to this action (and the parties have not disputed that
summary) as follows:

> Pursuant to the DMEA, weekly surveys are
> conducted by the National Agricultural
> Statistics Service ("NASS") to collect
> wholesale prices for representative products
> within each category.  The survey information
> is gathered from product manufacturers
> (sometimes referred to in pleadings as milk
> "handlers") who produce a million pounds or
> more of manufactured product per year.  The
> FMMO minimum prices for milk for class III
> (hard cheese) and IV (dry milk and butter)
> products are determined by applying the
> wholesale prices reported in the weekly
> surveys to formulae specified by the FMMO.
> The FMMO minimum prices for products in
> Classes I and II are derived by mathematic

considered to be "thin markets" because only a small percent of the
commodities were actually traded on them and, hence, they were subject
to potential price manipulation).

formulae from the prices determined in Classes III and IV.

Of significance to this action, one of the major wholesale pricing inputs collected by NASS for computation of the FMMO minimum price for milk for Class IV products is the wholesale price for NFDM [nonfat dry milk]. The DMEA requires handlers to submit NASS survey information  according to instructions that, among other things, direct the handler to exclude from the survey wholesale prices for NFDM for forward sales contracts.  Forward sales contracts are defined as contracts in which the selling price is set more than 30 days before the completion of the transaction. It appears undisputed that forward sales contracts generally reflected lower prices for NFDM than were reflected in contracts that were completed at or near the time of the transaction during the time period in question.

690 F. Supp. 2d at 1130–31.   NASS required the handlers/reporting firms to fill out "Annual Validation Worksheets" which included the question "[w]hen reporting nonfat dry milk sales data to NASS, did you or can you: exclude forward pricing sales (sales in which the selling price is established, and not adjusted, 30 or more days before the transaction is completed)?"

For enforcement purposes, the DMEA provides that "[e]ach [reporting firm] . . . shall maintain, and make available to the Secretary, on request, original contracts,

agreements, receipts, and other records associated with the sale or storage of any dairy products during the 2-year period beginning on the date of the creation of the records." 7 U.S.C. § 1637b(c)(6). The 2000 version of the DMEA also provided that "[t]he Secretary shall take such actions as the Secretary considers necessary to verify the accuracy of the information submitted or reported under this subtitle." Pub. L. No. 106-532, § 273(c)(3), 114 Stat. 2541. In 2008, the DMEA was amended and bolstered with the following provision:

> QUARTERLY AUDITS. — The Secretary shall quarterly conduct an audit of information submitted or reported under this subtitle and compare such information with other related dairy market statistics.

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 1510(b), 122 Stat. 9237 (codified at 7 U.S.C. § 1637b(c)(3)(B)).

Once NASS collects price and volume data, the AMS uses them to calculate the FMMO minimum raw milk prices. Nonfat dry milk ("NFDM") prices are one factor used by AMS to determine FMMO minimum prices. The DMEA contains no enforcement mechanism or mechanism for compensating producers who receive prices for their milk that are lower than they should be due to inaccurate reporting.[6]

---

[6] The AMAA contains no provision under which milk producers can challenge a marketing order through administrative review. *See United Dairymen of Ariz. v. Veneman*, 279 F.3d 1160, 1164 (9th Cir. 2002). The Supreme Court in *Stark v. Wickard*, 321 U.S. 288 (1944), held that producers could obtain judicial review of the Secretary of Agriculture's

## II.  Factual and Procedural Background

Plaintiffs are "dairy farmers located in states other than California who sold raw milk that was priced according to [FMMOs] during the time between January 1, 2002 and April 30, 2007."  690 F. Supp. 2d at 1129–30.  Defendants are: (1) DairyAmerica, Inc. ("DairyAmerica"), a non-profit entity "established by a group of nine dairy cooperatives for the purpose of marketing dairy products manufactured by the cooperatives" and (2) California Dairies, Inc., one of the nine cooperatives.  *Id.* at 1130.  It is alleged that DairyAmerica sells approximately 75 percent of the NFDM produced in the United States.

As stated by the district court:

> It is not disputed that, during the time in question, Dairy America submitted pricing information to the NASS survey that improperly included wholesale prices for forward contracts for NFDM.  Plaintiffs allege, and Defendants do not appear to

---

practice of deducting certain administrative expenses from the settlement fund before calculating the blended price which resulted in a reduced price for the producers.  The Court found a basis for judicial review because the AMAA had given producers "definite personal rights" and "the silence of Congress as to judicial review is, at any rate in the absence of an administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction."  *Id.* at 309.  In our consideration of the holdings in *Stark*, we concluded that "judicial review of the producers' complaint was necessary to 'ensure achievement of the Act's most fundamental objectives – to wit, the protection of the producers of milk and milk products.'"  *United Dairymen*, 279 F.3d at 1165 (quoting *Block*, 467 U.S. at 352).

> dispute, that approximately ninety percent of the contracts executed by Dairy America and reported in the weekly NASS surveys were forward contracts that should not have been reported in the NASS surveys according to DMEA procedures. Plaintiffs contends [sic] that, because forward contract prices were significantly below spot prices during the time period in question, the minimum prices set by the FMMO's for raw milk were significantly lower than would have been the case if the information provided by Dairy America to NASS had been provided according to instructions.

*Id.* at 1131. On account of DairyAmerica's market dominance, its erroneous reports had the effect of pushing FMMO minimum prices paid to milk producers noticeably lower than they would have been otherwise. Thus, because of its own transgressions, DairyAmerica obtained significant financial benefits from the lowered prices, to the detriment of plaintiff dairy farmers.

In March 2007, DairyAmerica's misreporting was revealed by *The Milkweed*, a dairy industry publication. In April 2007, DairyAmerica's CEO confirmed that misreporting to the NASS.

On or about April 20, 2007, NASS requested that all 39 firms that had reported NFDM data review their weekly price and sales volume submissions for the period of April 29, 2006 through April 14, 2007, and submit revisions. On June 28, 2007, NASS published "revised prices and sales volume" for NFDM, and the "AMS calculated that the errors in the

reporting of nonfat dry milk prices for the period April 29, 2006 through April 14, 2007 had increased the average 2-week price of NFDM by $0.0218 per pound and the average 4–5 week price of NFDM by $0.0193 per pound during a period of 14 months."

In February 2008, the USDA Office of the Inspector General ("OIG") issued a report regarding "the April 2007 discovery of the error in the reporting of nonfat dry milk prices." Office of Inspector Gen., U.S. Dep't of Agric., No. 26901-01-IR, Inspection Report: Survey and Estimation Internal Controls for Nonfat Dry Milk and the *Dairy Products Prices* Report i (2008), *available at* http://www.usda.gov/ oig/webdocs/26901-01-IR.pdf (last visited June 19, 2012). Among its findings were:

> A large dairy firm inappropriately included long-term forward contracted nonfat dry milk volume and price information in their weekly submissions to NASS. We found that this dairy firm has been including data for sales of this type since 2002.

> NASS then aggregated the misreported data from this large dairy firm with the weekly data submitted by other dairy firms for the same reporting period. This caused inaccurate nonfat dry milk aggregated volume and price statistics to be published weekly. The internal controls for the survey and estimation process used by NASS for the *Dairy Products Prices* report were inadequate, as this error went undetected from 2002 until April 2007.

NASS' published nonfat dry milk price statistics are utilized by AMS as a component of its formula for establishing federal milk marketing order (FMMO) prices. Given that incorrect nonfat dry milk prices were factored into the FMMO formula, the published FMMO prices were also incorrect. AMS issued a report on June 28, 2007 stating: "The total classified value of milk regulated under the FMMO program for the period covered by the NASS revision was understated by $50 million . . . " covering the period between April 29, 2006, and April 14, 2007.

. . . .

AMS did not have the authority to audit a reporting firm's books when the misreporting occurred. The authority was included in the Dairy Marketing Act of 2000, but the rulemaking necessary to implement a program of audits was not completed until July 2007. AMS began performing audits on August 6, 2007. Between August 6, 2007, and September 30, 2007, AMS visited seven plants reporting nonfat dry milk volume and price statistics. Based on these visits, AMS notified NASS of reporting discrepancies at six of the plants. NASS contacted these plants and explained the proper reporting criteria.

*Id.* at i–ii.

Following the release of the Inspection Report, NASS sent letters to "dairy firms" (*i.e.*, handlers) that reported NFDM information asking whether they had correctly related the NFDM data between January 4, 2002 and April 22, 2006, and, if they had not, to provide corrected data. None of the dairy firms provided corrected information, and, hence, the NASS (and consequently the USDA) was unable to publish revised NFDM data or FMMO prices for that period.[7]   In August 2007, AMS instituted a new auditing process which included in-person inspections of large dairy firms and their sales records.

Beginning in March 2009, each plaintiff filed a class action on behalf of a nationwide class of raw milk producers in federal court based on diversity jurisdiction. *See* 690 F. Supp. 2d at 1131.  The cases were eventually consolidated. *Id.*  The Amended Class Action Complaint contains four causes of action: the first and second claims for relief charged negligent misrepresentation and negligent interference with

---

[7] As noted by the NASS:

> In cases where there had been reporting problems, NASS provided the firms with their previously reported data and asked them to review and submit appropriate corrections.
>
> NASS agreed to summarize results of this process in a special report to be released on June 19, 2008. However, no firms provided corrected data, and therefore NASS will not issue a special report.

News Release, Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., NASS Will Not Issue Special Report on Nonfat Dry Milk Prices (June 19, 2008), *available at* http://www.nass.usda.gov/Newsroom/Notices/06_19_2008.asp (last visited June 19, 2012).

prospective economic advantage, respectively, both under California common law; the third claim asserted violation of California's Unfair Business Practices Law, California Business and Professions Code § 17200 *et seq*.; and the fourth claim alleged unjust enrichment under California common law.

Defendants filed separate motions seeking dismissal of the entire lawsuit on five grounds: (1) the filed rate doctrine barred plaintiffs' claims, (2) the DMEA confers no right of private enforcement, (3) the USDA is an indispensable party but immune from suit herein, (4) the price reporting program creates no legal obligation on defendants' part, and (5) plaintiffs' state law claims are preempted by the DMEA. The district court dismissed the monetary portions of all four claims *solely* on the grounds that they were not justiciable pursuant to the filed rate doctrine. 690 F. Supp. 2d at 1140–41. The district court also held that, while the filed rate doctrine purportedly does not bar injunctive relief, the third cause of action – wherein such relief was requested – was inadequately pled. *Id.* at 1140. In so ruling, the district court noted that:

> Because the filed rate doctrine applies narrowly to bar only claims that are based on minimum prices paid for raw milk, the court is not willing at this point to make the determination that there are no other facts that Plaintiffs could possibly plead that would cure the deficiency. Further, as noted, the court cannot determine at this point that there is no non-money equitable remedy available to Plaintiffs. For that reason the [amended

complaint] will be dismissed with leave to amend.

The court is also mindful that the filed rate doctrine consists of a body of law that has been the subject of conflicting interpretations. The court will therefore give favorable consideration to the motion of either party for interlocutory appeal on the issue of whether the filed rate doctrine bars Plaintiffs' claims in this case.

*Id.* at 1141.

Plaintiffs filed an initial appeal, but their appeal was dismissed because the district court's ruling was not a final order. *See WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Plaintiffs then moved in the district court to dismiss their complaint with prejudice so that this court could exercise jurisdiction. The district court granted that motion. Plaintiffs then filed a timely notice of appeal.

## DISCUSSION

## I.  Standard of Review and Applicable Procedural Law

We review *de novo* challenges to a dismissal for failure to state a claim under Federal Civil Rule 12(b)(6). *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir. 2011). That standard is applied to a district court's dismissal based on the filed rate doctrine. *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 849 n.16 (9th Cir. 2004), *amended*, 387 F.3d 966 (9th Cir. 2004); *Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1169 (9th

Cir. 2002). "Such review is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice." *N.M. State Inv. Council*, 641 F.3d at 1094; *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In undertaking this review, we will "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs," *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002), and will hold a dismissal inappropriate unless the complaint fails to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Because the only issues on appeal raised by plaintiffs concern the application of the filed rate doctrine and its preclusive effect in the present case and because the district court did not rule on defendants' other defenses (such as the purported lack of a private right of enforcement under the DMEA, the status of the USDA as an indispensable party, etc.), our decision is limited to the filed rate doctrine issues. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("[A] federal appellate court does not consider an issue not passed upon below."); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1050 n.1 (9th Cir. 2001) ("[W]e limit our review to issues argued in a party's opening brief.").

## II. The District Court Did Not Err in Concluding that the Agency-set Minimum Prices for Raw Milk Are Generally Subject to the Filed Rate Doctrine.

### A.  The Filed Rate Doctrine

As we observed in *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1033 (9th Cir. 2007): "The [filed rate] doctrine is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specified utilities, originally through rate-setting procedures involving the filing of rates with the agencies."  "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question."  *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007) (quoting *Transmission Agency v. Sierra Pac. Power Co.*, 295 F.3d 918, 929–30 (9th Cir. 2002)).  It has generally been recognized that there are three "purposes" or "governmental interests" which justify or support the filed rate doctrine.

The origin and justifications for the doctrine can be traced to the Supreme Court's early cases involving the Interstate Commerce Act ("ICA"). *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *see* Jim Rossi, *Lowering the Filed Tariff Shield: Judicial Enforcement for a Deregulatory Era*, 56 Vand. L. Rev. 1591, 1598-99 (2003) (henceforth *Lowering the Filed Tariff Shield*).  In *New York, New Haven & Hartford R.R. Co. v. ICC*, 200 U.S. 361, 391 (1906), the Court, in interpreting the ICA, stated:

> [T]he great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all, and to destroy favoritism, these last being accomplished by requiring the publication of tariffs, and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination.

Thus, the initial *raison d'être* for the doctrine concerned stabilizing rates and preventing pricing discrimination amongst ratepayers.[8]  *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990) ("The duty to file rates with the Commission and the obligation to charge only those rates have always been considered essential to preventing price discrimination and stabilizing rates." (citations omitted)).

Once it was determined that federal law required the primacy of filed rates and tariffs, there developed two additional and related justifications for the doctrine, *i.e.*, federal preemption (or the supremacy of federal law) and deference to federal agency expertise (or primary

---

[8] As noted in *Lowering the Filed Tariff Shield*, 56 Vand. L. Rev. at 1599:

> In original design, the [filed rate] doctrine was intended to serve as a sword to protect consumers from monopolistic price discrimination, such as a railroad charging different rates to customers of different states, or charging the shipping companies with whom it competes exorbitant prices, without justifications based on the cost of providing service to the customer.

jurisdiction).  As observed in *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 964 (1986):

> In *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981), the Court similarly noted that the filed rate doctrine as applied to the actions of the Interstate Commerce Commission assisted in the enforcement of the supremacy of federal law:
>
>> "The common rationale of these cases is easily stated: '[There] can be no divided authority over interstate commerce, and . . . the acts of Congress on that subject are supreme and exclusive.' *Missouri Pacific R. Co. v. Stroud*, 267 U.S. 404, 408 (1925).  Consequently, state efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity."  *Id.* at 318-319.

(Alterations in original and parallel citations omitted). Allowing filed rates to be subject to litigation in state courts (or in federal courts applying state law) could result in service rates and conditions varying across jurisdictions, which would conflict with the federal interest in uniformity.  *See Ark. La. Gas Co.*, 453 U.S. at 578-79 (permitting individual ratepayers or others to attack a filed rate "would undermine the congressional scheme of uniform rate regulation").  That conflict would be prevented by treating the filed rates as

having what amounts to a preclusive effect on state law rate-based claims.

The third justification concerns the unnecessary interjection of the courts into the rate-making process where they have no expertise or valid reason to interfere. *See, e.g.*, *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951) ("We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.").

The filed rate doctrine has been given an expansive reading and application in this Circuit, even in the face of "debate in other forums about [its] wisdom."[9]  *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 234 (1994) (quoting *Sec. Servs., Inc. v. Kmart Corp.*, 511 U.S. 431, 440 (1994)) (internal quotation marks omitted); *see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417–24 (1986); *but see Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1089 (9th Cir. 2004) ("[T]he filed rate doctrine now functions in the telecommunications field as an anomaly.  It is a relic, open to repudiation by the FCC."). In *E. & J. Gallo Winery*, 503 F.3d at 1035, after reviewing the doctrine and "associated principles" of federal preemption, we concluded that: "to the extent Congress has given [a

---

[9] For example, California has declined to create a state filed rate doctrine even where the tariffs are filed with the state regulatory agency having authority over the subject area and even if the rates have been approved as reasonable by that agency.  *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992–93 (9th Cir. 2000).

federal agency] authority to set rates under [a federal statute] and [the agency] has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally challenged under federal antitrust law or state law." *See also Wah Chang*, 507 F.3d at 1225-26 ("The filed rate doctrine's fortification against direct attack is impenetrable. It turns away both federal and state antitrust actions; it turns away Racketeer Influenced and Corrupt Organization Act actions; it turns away state tort actions; and it even turns away state attempts to assert sovereign power to commandeer power contracts." (footnotes omitted)).

**B.  The Filed Rate Doctrine Applies to the Minimum Rates for Raw Milk Set under FMMOs pursuant to the AMAA.**

No Supreme Court or federal appellate court case has considered whether the filed rate doctrine applies to marketing orders setting the prices for raw milk under the AMAA. However, a number of trial courts (in addition to the district court here) have held it does. *See, e.g.*, *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 732–34 (E.D. Tenn. 2011); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 894–95 (N.D. Ill. 2011); *Servais v. Kraft Foods, Inc.*, 631 N.W.2d 629, 633–35 (Wis. Ct. App. 2001); *but see Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 276 (D. Conn. 2003) (holding that, while filed rate doctrine does apply to challenges to milk pricing set under an FMMO, it does not apply to a challenge to a defendant's artificially inflated wholesale milk prices, which are permitted to be in excess of the minimum rates set under the FMMOs).

Originally, the filed rate doctrine arose in the context of the following paradigm. A rate or tariff within an industry regulated by federal statute is filed by a carrier or other service/product provider with a federal agency, which in turn accepts and publishes it. *See, e.g.*, *Sec. Servs., Inc.*, 511 U.S. at 435. Thereafter, the carrier (and its customer) is not allowed to charge (or pay) a different rate for that service/product other than the filed one. *Id.* ("We have held these provisions 'to create strict filed rate requirements and to forbid equitable defenses to collection of the filed tariff.'" (quoting *Maislin Indus.*, 497 U.S. at 127)). In turn, the rate is held not to be subject to challenge on antitrust, state law or most other grounds. *See, e.g.*, *Keogh v. Chi. & Nw. Ry. Co.*, 260 U.S. 156, 161–65 (1922); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) ("Simply stated, the doctrine holds that any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings brought by ratepayers."). As noted in *Ice Cream Liquidation*, 253 F. Supp. 2d at 275:

> Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results. Nor does the doctrine's application depend on the nature of the cause of action the plaintiff seeks to bring. Rather, the courts have held that the doctrine is to be applied strictly to prevent a plaintiff from bringing a cause of action whenever [the] purpose[s] underlying the filed rate doctrine [are] implicated.

(Citations omitted).

Here, admittedly, the statutory scheme created by AMAA does not present the typical filed rate scenario. For example, the handlers do not submit rates or prices to the AMS in order to create an unwavering price. Rather, various pricing data are provided to the NASS (some of which are supplied by handlers such as the defendants) and that data are utilized along with "make allowances" and "yields" (which are fixed by the agency's rules) in pricing formulas which, in turn, delineate the raw milk rates. *See* 7 C.F.R. § 1000.50 (2012). Also, the rates consist of only *minimum* prices from which the handlers and producers can deviate, albeit only in an upward direction (which favors the dairy producers). Further, the set rates are not uniform across the nation. They can vary amongst the eleven established milk marketing areas, and there are also locations without any applicable FMMOs (and hence no controlling filed rates). *See* 7 C.F.R. subtit. B, ch. X (2012); *Hillside Dairy Inc.*, 539 U.S. at 61. Additionally, the individual handlers make payments which vary according to the market value of the milk they use as reflected in the minimum payments, but all the milk producers in the area covered by the FMMO receive the same average, or blended, price per unit of milk. Finally, the FMMOs (which contain the pricing formulas), while promulgated by the USDA and subject to appropriate rulemaking proceedings including public hearing and comment, must be approved by the handlers of at least 50 percent of the volume of milk within the geographic area covered by the proposed order and at least two-thirds of the affected dairy producers in the region. *See* 7 U.S.C. § 608c(8). Nevertheless, despite those elements, there are sufficient attributes which justify the application of the doctrine to the AMAA milk pricing situation generally.

First, milk pricing is the subject of extensive federal statutory and regulatory control. *See, e.g.*, 7 U.S.C.

§ 608c(5).  Additionally, under the AMAA, the USDA (via the AMS and through the FMMOs) sets minimum prices for raw milk purchased from producers by handlers where there can be no downward deviation in the rate.  Therefore, to paraphrase *Gallo*, the filed rate doctrine is applicable because Congress has given the USDA authority to set rates under 7 U.S.C. § 608c(5) and the USDA has exercised that authority to create the FMMOs which, in turn, are utilized to establish minimum prices for raw milk purchases; and thus "such rates are just and reasonable as a matter of law."  503 F.3d at 1035.

Further, the three underlying justifications for the filed rate doctrine apply to FMMO prices set under the AMAA.  The setting of minimum rates prevents discriminatory pricing (albeit to a more limited extent than other situations where the doctrine has been applied) and stabilizes prices by assuring dairy producers of reasonable payments for raw milk as fixed by the AMS.  Additionally, the setting of minimum rates by means of formulas established in the FMMOs is a matter which clearly falls within an area of USDA expertise, which most courts would not possess.  Finally, the AMAA and its concomitant regulations establish a federal scheme as to uniform minimum pricing which should not generally be the subject of attack by ratepayers or others.  As stated in 7 U.S.C. § 602:

It is declared to be the policy of Congress –

(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to

farmers, parity prices as defined by section 1301(a)(1) of this title [7 U.S.C. § 1301(a)].

(2) To protect the interest of the consumer by (a) approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section . . . and (b) authorizing no action under this chapter which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section.

## C. Meaningful Review by the Federal Agency Is Not a Prerequisite to the Application of the Filed Rate Doctrine.

Plaintiffs challenge application of the filed rate doctrine here based on the contention that the USDA lacks "any actual legal authority to meaningfully review the substance of the pricing." They rely on *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992), where we held that the filed rate doctrine did not apply to title insurance rates filed with state insurance agencies because, although the rates were filed with the state agencies, they "were not subjected to meaningful review by the state." *Id.* at 394 (citing *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 337–38 (9th Cir. 1990)).[10]

---

[10] Plaintiffs also relied on our decision in *Wileman Bros.*, which is readily distinguishable from the present case. In *Wileman Bros.*, the defendants were nectarine and plum growers who served as members of committees appointed by the Secretary of Agriculture and who (without

We are not persuaded that *Brown* requires meaningful review for the filed rate doctrine to apply in all cases, however. In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986), the Supreme Court held that the filed rate doctrine applied to rates merely filed with the Interstate Commerce Commission ("ICC"), even when those rates had not been "investigated and approved by the ICC." Similarly, in *Gallo*, we held that the filed rate doctrine applied to market rates for natural gas authorized by the Federal Energy Regulatory Commission ("FERC"). The plaintiff argued that the filed rate doctrine applied only to "only rates that have been literally filed with and approved by FERC." 503 F.3d at 1039. We disagreed, emphasizing that the essential question was whether the market rates were *authorized* by the FERC. *See id.* We explained that the FERC was not required to use "any particular form of regulation in its quest to ensure reasonable rates." *Id.* It mattered only that the rates were authorized by the FERC in the exercise of its statutory authority. *See id.* at 1040–43.[11]

_____

the Secretary's authorization) issued and enforced a "well-matured" standard governing when those varieties of fruits could be picked. *Wileman Bros.* did not involve a tariff or rate submitted to or issued by a federal agency. Thus, the filed rate doctrine was not applicable to that situation. Further, the holding of that case was that the defendants could not establish immunity from antitrust claims on the simple basis that the Secretary had "tacitly" approved the higher maturity standards they issued by his failing to explicitly disapprove them, as he could have done under applicable regulations. *See* 909 F.2d at 337-38.

[11] *Gallo* relied on an earlier case involving market rates for electricity, where it was held that the filed rate doctrine applied because the FERC was "doing enough regulation to justify federal preemption of state laws." *Gallo*, 503 F.3d at 1041 (quoting *Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 760 (9th Cir. 2004)). In *Gallo* too, we concluded that the FERC was doing enough regulation

Thus, like the district courts that have addressed the issue, we do not read *Brown* as making meaningful agency review a *sine qua non* for the applicability of the filed rate doctrine. *See In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 754 F. Supp. 2d 1239, 1245–46 (W.D. Wash. 2010) (collecting cases that characterize *Brown* as an "outlier" decision on the issue).

The proper inquiry, therefore, is whether the FMMO minimum prices were authorized by the USDA pursuant to its statutory authority, or, to paraphrase *Gallo*, whether the USDA was doing enough regulation to justify federal preemption of state laws. *See Gallo*, 503 F.3d at 1041. We conclude that it did.

The applicable statute required the Secretary to issue orders which provided for a particular, but partial, methodology for establishing minimum uniform prices for raw milk. 7 U.S.C. § 608c(5). It is not disputed that the Secretary exercised his discretion and promulgated regulations governing that rate setting process and issued orders in the form of the FMMOs to effectuate those

---

for the filed rate doctrine to apply. First, the FERC determined that the best way to ensure just and reasonable rates in the evolving natural gas market was to allow natural gas sales to proceed at market prices. *See id.* at 1041–42. Second, the FERC reviewed the natural gas market and determined it was competitive. *See id.* at 1042. Third, although the FERC did not impose individualized reporting requirements on sellers of natural gas, it maintained ongoing oversight of the market and took corrective responses to evidence of market manipulation. *See id.* We thus concluded that, "[b]ecause FERC has not abdicated its responsibilities but has acted, albeit with a light hand, to authorize just and reasonable rates in the natural gas arena, the Filed Rate Doctrine continues to preempt any rate-setting activities by the courts and bar federal antitrust claims under the Filed Rate Doctrine." *Id.*

requirements of the statutory scheme. Part of the methodology includes formulas which are dependent upon the input of sales prices and volumes supplied by designated handlers.

Plaintiffs argue that the prices DairyAmerica reported to NASS are comparable to market-based rates like those in *Brown* because AMS only had the power to take NASS data, plug them into a predetermined formula, and then publish the resulting FMMO prices. Once the prices were reported to NASS, in other words, the rest of the pricing was mechanical and amounted to silence by AMS. Moreover, as plaintiffs argue, AMS did not have (at that time) the power to review the accuracy of data collected by the NASS. However, plaintiffs do not contend that the Secretary did not have the statutory authority to review the accuracy of NASS data.[12] Instead they argue that the USDA's implementing regulations did not, during the applicable time frame, contain any explicit provision for such a review. In opposition, defendants point out that the USDA has, in at least 18 instances, used its discretion to change the price data it used to calculate milk prices.[13] Plaintiffs counter that, under the relevant implementing regulations, AMS only has the power to do so "[i]f for any reason a price or pricing constituent required for computing the prices described in § 1000.50 is not available."

---

[12] The USDA clearly had statutory authority. Plaintiffs' Complaint alleges that the Secretary issued a rule that allowed for such review in 2007. Thus, even if the Secretary did not choose to review the accuracy of data reported to NASS, he had the power to do so.

[13] Defendants' citations are to the federal register and, hence, judicially noticeable. *See* 44 U.S.C. § 1507.

7 C.F.R. § 1000.54 (2012). Section 1000.50 calculates rates based on NASS pricing data.

Plaintiffs clearly underestimate the extent of the agency's authority (and its execution of those powers) in setting the minimum prices under the FMMOs. Indeed, the USDA here did far more than the FERC in the *Gallo* case in this regard. First, the agency promulgated regulations which created an intricate system for the setting of the prices. Unlike the FERC in *Gallo* which merely "reviewed the natural gas market and determined it was competitive," 503 F.3d at 1042, the USDA not only examined the dairy products market, but also took into account volume, location, grade/quality of the milk, production differentials, and other factors in creating the formulas in the FMMOs. Also, the formulas do not consider only one or two data points but a large number of them to arrive at the ultimate price determination. Additionally, the formulas which generate the rates also include the consideration of "make allowances" and "yields" which are fixed by the agency's rules. Further, the FMMOs are not effective until the Secretary obtains the approval of handlers of at least 50 percent of the milk processed and two-thirds of the affected dairy producers within the geographic territory subject to the order. 7 U.S.C. § 608c(8). Thus, the Secretary exercises extensive authority vis-a-vis milk pricing in establishing the formulas in the FMMOs which in turn set the parameters for the issued minimum prices.

Additionally, as in *Gallo*, the USDA here maintained ongoing oversight of the market and initiated remedial actions in response to evidence of market manipulation. Indeed, upon being informed of the misreporting by DairyAmerica, the agency took steps to determine the effect of the misinformation, calculated corrective prices for the

periods when the original data were available, and enacted regulations and amendments to the FMMOs for improved oversight of the reporting process. Furthermore, plaintiffs' contention (that AMS did not and could not do anything but accept the NASS data even if it knew they were unreliable) is incorrect. Plaintiffs' argument is essentially that, had DairyAmerica provided false pricing information to NASS and then sent a letter to AMS saying "we made this data up," AMS would have been obligated to use that data to set prices. That is, to say the least, a curious interpretation of the pertinent regulations, *i.e.*, 7 C.F.R. §§ 1000.50 and 1000.54. Indeed, during the relevant period, the market administrators (who were empowered to administer the FMMOs) had the authority to (1) make rules and regulations to effectuate the terms and provisions of the FMMOs, (2) receive, investigate, and report violations to the Secretary, and (3) recommend amendments to the Secretary. *See* 7 C.F.R. § 1000.25(b) (2004).

In sum, the USDA did possess the authority and did exercise it to address problems as to the agency-set minimum prices for raw milk under the FMMOs, such that the filed rate doctrine is applicable in the present AMAA situation.[14]

---

[14] Plaintiffs also cite three cases from the same district court which declined to apply the filed rate doctrine to Medicaid reimbursement rates for prescription drugs. Each case, however, rejected the application of the doctrine at least in part because there were no filed rates. *Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 329 (D. Mass. 2005) (holding that the filed rate doctrine was inapplicable because "[t]he reported data do not control the rates which Defendants can charge customers, as a tariff would"); *In re Lupron Mktg. and Sales Prac. Litig.*, 295 F. Supp. 2d 148, 163 n.16 (D. Mass. 2003); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 192 (D. Mass. 2003) (holding that filed rate doctrine did not apply because pharmaceutical companies do not file rates

**III.    Precedent Does Not Require and Policy Considerations Do Not Support Applying the Filed Rate Doctrine as a Bar under the Facts of This Case.**

Plaintiffs argue that even if the filed rate doctrine applies to agency-set milk prices in general, it should not serve as a bar in this case, since the USDA has indicated that it would have set different prices had DairyAmerica reported its data correctly. We know that prices would have been different but for the misreporting, because (1) the NASS issued retroactive revised prices for part of the relevant period after DairyAmerica acknowledged its erroneous reporting, and (2) AMS calculated the increase in the prices of NFDM for the period between April 29, 2006 and April 14, 2007. We agree that the filed rate doctrine does not preempt or otherwise pose a preclusive bar to plaintiffs' lawsuit, because: (1) the federal agency itself determined that the FMMO prices were incorrect and (2) the policy considerations behind the doctrine do not justify applying the doctrine as a bar in this case.

Plaintiffs initially attempt to avoid the strictures of the filed rate doctrine by arguing that they are not actually seeking to challenge a fixed rate at all. However, we have made it clear that the doctrine precludes remedies which rely on a court's recalculation of rates which would have been charged, even if the plaintiff is not directly challenging the filed rate:

---

with any agency). Furthermore, none of these cases address the doctrine at significant length and they would not therefore be particularly persuasive even if they were on point.

>Wah Chang cannot avoid the fact that it seeks what amounts to having the courts determine what rates the Energy Companies should have charged instead of the rates they did charge. Wah Chang would inevitably drag the courts into a determination of what rate would be fair and proper. That is precisely what Wah Chang cannot do.

*Wah Chang*, 507 F.3d at 1226. Establishing damage amounts for plaintiffs' claims, similarly, would require calculating what rates would have been set but for the defendants' misreporting. For this reason, it would be unavailing for plaintiffs to rely on *Gallo*'s dictum that "[w]e are aware of no basis for holding that the Filed Rate Doctrine bars claims based on a reference point for pricing transactions (be it a trade index, the Consumer Price Index, or the New York Stock Exchange) that is not itself a FERC-approved rate." *Gallo*, 503 F.3d at 1048 n.15. Still, as discussed below, it is a different situation where the agency itself in the context of the AMAA/DMEA recognizes that its issued rates are in error due to the misconduct of the enriched party.

### A.  The Filed Rate Doctrine Does Not Bar Plaintiffs' Claims Given the USDA's Recognition That Its Published FMMO Rates Were Incorrect Due to Defendants' Misreporting.

The Supreme Court has said that the filed rate doctrine does not apply to bar a private litigant's rate-related claims if the rate has been "suspended" or "set aside" by the relevant

agency. *Keogh*, 260 U.S. at 163.[15]  Whether an agency has sufficiently rejected a rate for purposes of the filed rate doctrine analysis, whether that rejection should eliminate the doctrine's preemptive bar, and, even if the bar is so removed, whether thereafter a plaintiff should be allowed to recover damages arising from the incorrect prior rates are admittedly difficult issues.  They can only be correctly answered after consideration of the underlying statutory scheme in which the doctrine is being applied and the justifications for the doctrine.

Initially, the defendants contend that the issues disputed herein were settled by *Ark. La. Gas Co.*, where the Supreme Court held that the filed rate doctrine prohibited a federally regulated seller of natural gas from charging higher rates than those filed with the FERC despite the contention that, had the seller applied for a higher rate, the FERC would have approved it.  453 U.S. at 573–76, 584–85.  In that case, the Court did not find compelling the argument that the defendant's misconduct (a breach of contract) had prevented

---

[15] *Accord City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981):

> Under the Keogh or "filed rate" doctrine, . . . a public utility subject to regulation is not subject to antitrust liability to its customers for rates or services provided under tariffs approved by the appropriate regulatory agency. The rationale is that the regulatory agency determines the legal rate and the utility must collect it while it is in effect.  The doctrine applies to rates that have been published but not acted upon by the regulatory agency, because they are the legal rates until suspended or set aside.

(Citation omitted).

the plaintiff seller from filing for a higher rate.[16]  *Id.* at 583. However, the Court specifically focused on the controlling statute (*i.e.*, the Natural Gas Act, 15 U.S.C. § 717 *et seq.*).  It observed that:

> Not only do the courts lack authority to impose a different rate than the one approved by the Commission, but the Commission itself has no power to alter a rate retroactively. When the Commission finds a rate unreasonable, it "shall determine the just and reasonable rate . . . to be *thereafter* observed and in force." § 5 (a), 52 Stat. 823, 15 U. S. C. § 717d (a) (emphasis added).

*Id.* at 578.    Based upon the plain text of the statute specifically precluding the FERC from altering a published rate retroactively as well as ordering any reparations based on the unlawfulness of past rates, the Court concluded that a state court could not be allowed "to award what amounts to a retroactive right to collect a rate in excess of the filed rate [because it would] 'only accentuate[] the danger of conflict.' . . . [and constitute a] usurpation of federal authority." *Id.* at 584.[17]

---

[16] The Court in *Ark. La. Gas Co.* also noted that "[w]e save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct."  *Id.* at 583 n.13.

[17] Defendants also cite *Montana-Dakota Utilities Co.* where the Court declined to order the lower court to direct an agency to make a retroactive determination where Congress had not granted such authority to the agency.  341 U.S. at 254.  It was noted that the agency's decision was required because the reasonableness of the rate charged, which could only be assessed by the agency, was determinative as to whether the plaintiff

Obviously, where the controlling statute prohibits the federal agency from altering a filed rate retroactively or limits any application of reconsidered rates to prospective situations, then the agency cannot effectively suspend or set aside the published rates for purposes of a lawsuit seeking recovery based on injuries arising from the imposition of those rates. However, unlike the Natural Gas Act, there is nothing in the AMAA or the DMEA which specifically bars the USDA from revising rates where handlers have supplied incorrect data to the agency.

Turning to the issue of the extent to which the federal agency must indicate that it is suspending, setting aside or otherwise rejecting the filed rate, it is noted that a large segment of the cases dealing with the filed rate doctrine arise in the context of statutes such as the ICA, the Communications Act, and legislation involving the FERC, where an anti-discriminatory policy as to filed rates or tariffs lies at the very heart of the statutory scheme. *See, e.g.*, *New York, New Haven & Hartford R.R. Co.*, 200 U.S. at 391; *AT&T Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 223 (1998). In such situations, a federal agency's ability to set aside a published rate retroactively would be extremely limited and, hence, any attempt to do so would have to be explicitly executed and thoroughly explained. For example, in *Keogh*, it was held that a rate that is filed with the ICC (and, after hearings, is approved by the Commission) is deemed reasonable and non-discriminatory as a matter of law, "[u]nless and until suspended or set aside." 260 U.S. at 160–63. However, the Court observed that in the context of the ICA, setting aside or suspending the published tariff for

---

had a viable cause of action and a basis for the federal courts to exercise jurisdiction. *Id.* at 253–54.

purposes of a legal action for damages would be extremely difficult because (1) any such case which led to a damages award to the plaintiff shipper would operate as "a preference over his trade competitors" and vitiate the paramount purpose of the ICA (*i.e.*, preventing pricing discrimination), and (2) in any such proceeding, "the Commission [would have to] determine whether a rate is discriminatory . . . . But by no conceivable proceeding could the question whether a hypothetical lower rate would under conceivable conditions have been discriminatory, be submitted to the Commission for determination." *Id*. at 163–64.

Plaintiffs cite to the Supreme Court's decision in *Maislin* for the proposition that the doctrine does not bar claims challenging prices that were rejected by the relevant agency. That reading of the case is overbroad. In *Maislin*, the Court noted the ICA prohibited both carriers and shippers from deviating from published tariffs filed with the ICC, but also required that the carrier's rates be nondiscriminatory and reasonable, and charged the ICC, upon determining that a rate or practice violates the statute, with prescribing the subsequent rate or practice to be followed. 497 U.S. at 119–20. In 1986, in response to a growing trend wherein carriers and shippers privately negotiated rates lower than those filed with the agency, the ICC concluded that changes in the motor carrier industry "clearly warrant[ed] a tempering of the former harsh rule of adhering to the tariff rate in virtually all cases," and so it established a new policy whereby in referenced cases it would "decid[e] if the collection of undercharges would be an unreasonable practice." *Id.* at 121. A carrier that had entered into such a private contract went bankrupt, and its bankruptcy estate

brought an action against the shipper to collect the difference between the contract rate and the higher filed tariff. The Court initially held that "The filed rate doctrine . . . contains an important caveat: The filed rate is not enforceable if the ICC finds the rate to be unreasonable." *Id.* at 128. The Court went on to quote from *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 384 (1932), that "Under [the Act] the shipper was bound to pay the legal rate; but if he could show that it was unreasonable he might recover reparation." *Id.* at 129 (alteration in original).[18]

---

[18] However, the Court found that the ICC had not found the *rates* were unreasonable but rather that the carrier had engaged in an unreasonable *practice*. It then held that:

> The Commission argues that under the filed rate doctrine, a finding that the carrier engaged in an unreasonable practice should, like a finding that the filed rate is unreasonable, disentitle the carrier to collection of the filed rate. We have never held that a carrier's unreasonable practice justifies departure from the filed tariff schedule. But we need not resolve this issue today because we conclude that the justification for departure from the filed tariff schedule that the ICC set forth in its *Negotiated Rates* policy rests on an interpretation of the Act that is contrary to the language and structure of the statute as a whole and the requirements that make up the filed rate doctrine in particular.

> Under the *Negotiated Rates* policy, the ICC has determined that a carrier engages in an unreasonable practice when it attempts to collect the filed rate after the parties have negotiated a lower rate. The ICC argues that its conclusion is entitled to deference because § 10701 does not specifically address the types of practices that are to be considered unreasonable and because its construction is rational and consistent with

Thus, *Maislin* stands, in part, for the limited proposition that, where the statute allows the agency to decide that a published tariff is unreasonable under controlling law, the filed rate doctrine will not bar a plaintiff from seeking reparation from the imposition of the unreasonable rate.

The Supreme Court in *ICC v. American Trucking Associations*, 467 U.S. 354 (1984), considered the related issue regarding the extent to which an agency can retroactively reject a previously filed rate. In the Motor Carrier Act of 1980, 49 U.S.C. § 10706(b)(3), Congress set forth specific guidelines to which motor carrier rate bureaus had to comply in order to receive antitrust immunity. In response, the ICC issued an interpretive ruling wherein it proposed to adopt a new remedy wherein it would retroactively reject "effective" tariffs that had been submitted in substantial violation of the law. It based its authority to adopt that remedy on former 49 U.S.C. § 10762(e), which provided that the "Commission may reject a tariff submitted to it by a common carrier . . . if that tariff violates this section or regulation of the Commission carrying out this section."

---

the statute. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 843 (1984).

We disagree. For a century, this Court has held that the Act, as it incorporates the filed rate doctrine, forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate. See *supra*, at 126-128. By refusing to order collection of the filed rate solely because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination that the Act by its terms seeks to prevent.

497 U.S. at 129–30 (footnote omitted).

*Id.* at 359–60.  The Court held that section 10762(e) did not authorize the Commission to reject effective tariffs, but nevertheless found that the ICC's authority "is not bounded by the powers expressly enumerated in the Act . . . . [but that] the Commission also has discretion to take actions that are 'legitimate, reasonable, and direct[ly] adjunct to the Commission's express statutory power.'" *Id.* at 364–65 (third alteration in original) (quoting *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 655 (1978)).  The Court found the ICC's new remedy to be a "justifiable adjunct to its express statutory mandate."  467 U.S. at 370.

The district court here considered the issue of whether the FMMO prices were rejected by the agency such that the filed rate doctrine would be inapplicable.  It found that the USDA had disapproved of the rates but then stated that "the issue before the court is whether the disapproval of rates by the regulating agency can be held by the courts to operate retroactively."  690 F. Supp. 2d at 1139.  The court relied on both *American Trucking* and *City of Groton* to hold that "rejection" in the context of filed rate doctrine analysis necessarily involves (1) the agency's (presumably formal) suspension or setting aside of the published rates, and (2) a finding that a "statutory mandate" would be furthered by the retroactive rejection of the minimum pricing structures set

forth in FMMOs in question.[19] *Id.* at 1139–40. We disagree with the first point and conclude that the second was satisfied.

As discussed above, the primary purposes of the AMAA and DMEA are: (1) "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices," 7 U.S.C. § 602(1), and (2) "the protection of the producers of milk and milk products," *Block*, 467 U.S. at 352. Additionally, the prices that are set for raw milk under the applicable statutes are minimum rates which can be (and are) subject to further negotiation between handlers and dairy

---

[19] The district court also held that the filed rate doctrine should preclude plaintiffs' claim for damages because they had not alleged that DairyAmerica's actions were willful or knowing. 690 F. Supp. 2d at 1139–40. Plaintiffs argue that NASS's instructions were clear and that the fact that DairyAmerica's reporting errors were self-serving suggests that its misstatements were knowing. The Supreme Court made a similar inference in *American Trucking*, holding that "[t]he guidelines for antitrust immunity . . . are of such a nature that carriers who submit tariffs in substantial violation of agreements will be aware of their transgressions." 467 U.S. at 370–71. The regulations in this case were similarly clear ("don't report long-term prices" is not a very hard instruction to understand), yet we need not address the issue of whether DairyAmerica's misreporting was intentional because neither the district court nor the parties have identified a precedent which holds that knowledge is determinative of plaintiffs' right to proceed. The district court quotes *Cooperative Power Association v. FERC*, which held that *American Trucking* "approved retroactive tariff rejection as a sanction for knowing violations of agreements" but omits its qualification that the Supreme Court's decision was premised on the assumption that "any carrier in substantial violation of a rate-bureau agreement would be aware of the violation." 739 F.2d 390, 391 n.3 (8th Cir. 1984) (per curiam). *Cooperative Power* contains no language *requiring* knowledge. And since *American Trucking* assumed knowledge, it did not reach the question of whether damages could be recovered without it.

farmers. Those rates are not initially filed and reviewed by the agency but rather are the product of formulas established by the USDA which are, in part, dependent upon the receipt of pricing data from certain handlers. In such a situation, there is nothing in the controlling statutes or concomitant regulations that would appear to require any formal process or particular expression for the agency's retroactively setting aside or rejecting milk prices that have been incorrectly set as a result of misreporting by certain handlers. Further, the statutory goals as to an orderly mandate of marketing conditions and the protection of milk producers would both be served by imposing consequences on handlers for misreporting data[20] that resulted in incorrect FMMO pricing and multimillion dollar losses for dairy farmers.

Neither *Keogh*, *Maislin*, nor *American Trucking* addresses the issue of what specific steps an agency need take before it can be deemed to have "rejected" a rate. Such a question cannot be considered in a vacuum; the steps required before an agency's rate "rejection" should be recognized will necessarily vary based on both the statutory framework within which the agency acts and upon the purposes of the statute in furtherance of which the agency acts. In *American Trucking*, the Court noted that the agency itself had limited its rejection powers such that "effective tariffs will be nullified only upon findings of substantial violations of rate-bureau agreements." 467 U.S. at 370. Neither *Keogh* nor *Maislin* had the opportunity to address this issue of *when* an agency has taken sufficient steps to officially disapprove a rate. We

---

[20] The district court found that about 90 percent of the contracts reported to the NASS by DairyAmerica were forward contracts, which under DMEA procedures were not to be included in the data provided to the NASS. 690 F. Supp. 2d at 1131.

conclude that the USDA's actions here constitute a sufficient rejection such that the filed rate doctrine is not a bar. Further, the statutory mandate of the AMAA and the DMEA, as well as the policies of the filed rate doctrine more generally, are furthered by our conclusion that the filed rate doctrine does not apply to bar plaintiffs' claims here.

The USDA adequately expressed its disapproval of the FMMO prices.[21] While the USDA's recalculation of minimum dairy prices was not explicitly called a rejection, the agency recognized that earlier filed rates were incorrect at the time they were filed and imposed significant and improper costs on producers. These "revisions" were, as AMS made clear, not necessarily complete since "reallocation effects [were] not considered." The USDA also sought to recalculate prices for the whole class period, but could not do so because dairy handlers did not supply it with accurate data on their sales of NFDM for the entire class period. While plaintiffs seek to characterize these revisions as a wholesale repudiation, and defendants as a mere speculative exercise, the reality is that AMS did recognize and attempt to estimate the impact of DairyAmerica's misstatements. The Secretary

---

[21] While the defendants argue that the AMS (which defendants characterize as "the division that the Secretary charged with FMMO minimum price oversight and enforcement") did not reject or change previously announced FMMO prices as a result of the discovery of their misreporting, the USDA OIG has stated: "Given that incorrect nonfat dry milk prices were factored into the FMMO formula, AMS has stated that its published FMMO prices were incorrect. According to the AMS, this caused the total value of milk to be understated by $50 million between April 29, 2006 and April 14, 2007." Further, on June 28, 2007, AMS issued a report on "Impacts of NASS Nonfat Dry Milk Price and Sales Volume Revisions on Federal Order Prices" which was based on revisions due to the discovery of the misreporting.

then took actions to revise regulations to prevent such misreporting from recurring. The USDA took no further action, noting that "[a]ll of the funds in the FMMO pools for the 14-month period covered by NASS' revision had previously been disbursed to the milk producers, and corrective disbursements to producers were no longer possible." But the USDA also recognized that the rates that were filed were incorrect at the time they were filed. Indeed, when members of Congress, outraged by the uncompensated losses suffered by the milk producers, asked what plans the agency had to remedy the situation, the USDA responded by ensuring that, moving forward, the agency would promulgate regulations providing for more oversight responsibilities and more effective enforcement mechanisms. *See* 7 C.F.R. pt. 1170 (2012).

Given that at the time of the misreporting the agency lacked the authority to sanction DairyAmerica,[22] the record supports the conclusion that the USDA rejected the FMMO rates at issue. It is in precisely this scenario that *Maislin* and *Keogh* recognized that the filed rate doctrine should not bar a private litigant from pursuing claims involving those rates.

Our holding will not permit a flood of litigation such that the filed rate doctrine will be circumvented every time a milk producer has a quibble with FMMO prices. To the contrary, this case presents a narrow exception to the general rule that the filed rate doctrine not only applies but functions so as to bar FMMO price-related claims. Here, we are faced with the

---

[22] Because the USDA itself had no mechanism for retroactive sanctions, plaintiffs reason, it could only have attempted to calculate revised rates to facilitate private litigation (they deny, however, that such an interpretation of the agency's actions is necessary for their claims to succeed).

unusual situation where (1) the misreporting is both significant in scope and undisputed between the parties, (2) the USDA has recognized that the FMMO rates based on DairyAmerica's erroneous reports were incorrect, and (3) permitting the rate-related claims to move forward is the only way to remedy the injuries suffered by the milk producers, the very class of persons the statutory scheme was enacted to protect.

## B. The Purposes of the AMAA and DMEA Would Not Be Served by Giving the Filed Rate Doctrine Preemptive Effect Here.

The district court reasoned that "while the DMEA sets forth procedures for the submission and collection of milk pricing survey data, there is nothing to indicate a 'statutory mandate' that would be furthered by the retroactive 'rejection' of the minimum pricing structures set forth in the FMMO's in question." 690 F. Supp. 2d at 1139. Yet, as cited by plaintiffs, the DMEA's mandate is that the USDA "shall establish a program of mandatory dairy product information reporting that will . . . provide timely, accurate, and reliable market information." 7 U.S.C. § 1637b(a). Their complaint includes numerous statements from legislators which suggest that the DMEA, by compelling dairy firms to provide information to NASS, was intended to help AMS produce more accurate prices. Retroactive adjustment of FMMO rates provides a straightforward incentive for reporting firms to obey the DMEA which would increase the accuracy and reliability of market information and ensure that AMS sets correct and accurate prices.

Further, the AMAA (which is the underlying legislation) was created to stop the "destabilizing competition" among dairy farmers and the essential purpose of the FMMO scheme is to raise *producer* prices. *Block*, 467 U.S. at 341–42. It would be contrary to those statutory purposes to hold that a handler who misreports required data (which results in potentially millions of dollars in losses to dairy producers and unjustified monetary benefits to itself) should be able to avoid liability because of the absence of a specific provision as to retroactive remedies, even after the agency has found misconduct by that party.[23] However, the plaintiffs here are proceeding under state law, not federal. Hence, at this point, it is only the filed rate doctrine that has been utilized as a barrier to their case.

## C. The Purposes of the Filed Rate Doctrine Do Not Support Applying It as a Bar under the Facts of This Case.

Since the cases cited by both plaintiffs and defendants provide, at best, vague guidance on the applicability of the filed rate doctrine to the facts of this case, this court would look again to the purposes of the doctrine in the context of the present statutory scheme. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1266–67 (9th Cir. 1982) (applying *Keogh*'s policy considerations to determine that the filed rate doctrine was not a bar). Courts typically describe the filed rate doctrine as having three purposes: deference to agencies' greater expertise in rate-setting, preventing discrimination by ensuring all ratepayers

---

[23] If the acts of misreporting by the handler were considered to be violations of the FMMO orders themselves, the AMAA provides for civil penalties of up to $1,000 for each such violation. 7 U.S.C. § 608c(14)(B).

face the same price, and avoiding disruption of a Congressional scheme for uniform price regulation. *Wegoland Ltd.*, 27 F.3d at 21. All of these goals would be implicated by a reversal of the district court's decision.

### 1. Assessing damages would not require excessive speculation or hypothetical considerations of agency decision making.

Defendants argue that the filed rate doctrine should be applied because, even with the NASS recalculation, the district court would have a great deal of trouble calculating damages. Plaintiffs counter that the formula used to convert NFDM data to FMMO prices was at all relevant times fixed by statute and regulation. Defendants concede this, but argue that a shift in the filed rate would have had substitution effects[24] and hence a simple recalculation of the FMMO rates would not produce an accurate measure of damages. In other words, if DairyAmerica had accurately reported NFDM prices, some FMMO prices would have been different. That price difference would have given market participants a different set of relative prices for different classes of milk which in turn would have produced losses or gains that cannot be captured by AMS's mere revision of FMMO prices. This is certainly true to some extent, but it is impossible to say how large this effect would have been

---

[24] AMS referred to these as "reallocation" effects. Defendants call them a "dynamic model." But all parties are referring to the same phenomenon.

without more facts.  Given that the differences in prices were two cents per pound of NFDM, it seems likely that any substitution effects would have been relatively small.[25]  On the other hand, the aggregate effect of just 14 months of misstated prices was $50 million, so substitution effects might still have been significant.

But some uncertainty can arise in any calculations of damages, but that does not preclude recovery where it is clear that some damage has occurred.[26]  Unlike the damages

---

[25] Defendants also note that other firms' misstatements were included in the revised figures issues by NASS and then argue that plaintiffs might not be able to get data from firms besides DairyAmerica in discovery and hence would not be able to calculate accurate revised prices using the FMMO formulas.  But if plaintiffs seek to recover damages from DairyAmerica only, damages would be measured by the effect DairyAmerica's misstatements alone had on the FMMO prices.  Also, as noted above, DairyAmerica sells about 75 percent of the NFDM produced in the United States, and approximately 90 percent of its contracts reported in the weekly NASS surveys were forward contracts which should not have been included.

[26]  As stated in *Clemente v. State*, 707 P.2d 818, 828 (Cal. 1985):

> In general, one who has been tortiously injured is entitled to be compensated for the harm and the injured party must establish "by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit." (Rest.2d Torts, § 912, p. 478.)  However, "[t]here is no general requirement that the injured person should prove with like definiteness the extent of the harm that he has suffered as a result of the tortfeasor's conduct. It is desirable that responsibility for harm should not be imposed until it has been proved with reasonable certainty that the harm resulted from the wrongful

contemplated in *Keogh*, those in the present case are not "purely speculative" or "supplied by conjecture," and "proof of such facts" is not "impossible." 260 U.S. at 164–65. To prevail in *Keogh*, the plaintiffs would have had to show not only that the rate would have been different had the defendants' misconduct not occurred, but that the ICC would have disapproved of that different rate. *Id.* at 164. In the present case, by contrast, the actions the USDA would have taken had it had correct data from DairyAmerica are clear: the USDA would have announced different FMMO prices, ones more favorable to the producers. It is only the specific prices that would have been set which remain somewhat unclear. Calculating damages would not, therefore, involve the kind of "hypothetical" speculation about agency decisions that *Keogh* forbids.

### 2. Plaintiffs' claims do not pose a significant risk of price discrimination or destabilization.

Discrimination in the present context relates to the concern that "[i]f [one party] could recover . . . damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade

---

> conduct of the person charged. It is desirable, also, that there be definiteness of proof of the amount of damage as far as is reasonably possible. It is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." (Rest.2d Torts, § 912, com. a, at p. 479.)

(Alteration in original).

competitors." *Id.* at 163.  Plaintiffs contend that discrimination is not an issue because their suit's class-action allegations ensure that all affected milk producers will be treated alike.  Defendants counter that the Supreme Court has ruled that class action status alone is not enough to defeat the filed rate doctrine*.  Square D*, 476 U.S. at 423.  We have endorsed an opinion of the Second Circuit which interpreted *Square D* to hold that the principle of nondiscrimination still suggests the filed rate doctrine should be applied in class actions. *In re NOS Commc'ns*, 495 F.3d 1052, 1059 (9th Cir. 2007) (citing *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998)).  *Marcus*, however, qualified this holding: "We agree that 'the concerns for discrimination are *substantially alleviated* in [a] putative class action' . . . . . However, the Supreme Court has rejected the suggestion that . . . the nondiscrimination principle [is] inapplicable to a putative class action suit." *Marcus*, 138 F.3d at 61 (first alteration in original) (emphasis added) (citations and internal quotation marks omitted). *NOS Communications* should, therefore, be read as rejecting any blanket rule that discrimination is not a concern in class actions, but still not going so far as holding that putative class action status is irrelevant to our inquiry into the discriminatory impact of not applying the filed rate doctrine.

While putative class action status does not resolve the question, defendants' arguments that judgment in favor of plaintiffs would have a discriminatory effect are weak. Defendants contend that awarding damages against DairyAmerica would discriminate against them in comparison with other milk handlers.  However, as observed above, the prohibition against discriminatory pricing under the AMAA is concerned with discrimination suffered by the dairy producers, not the handlers.  In any case, were damages

assessed against it, DairyAmerica would not be paying a higher (discriminatory) rate at all; it would be paying damages corresponding to the higher rate its own mistakes (or bad acts) had previously caused producers to pay it. It would therefore not, as defendants contend, "face higher/non-uniform prices for the relevant period." Instead, it would face the same prices as everyone else and also a separate damage award. That award might, certainly, put it at a disadvantage relative to its competitors (though it is unclear how large that disadvantage would be given that it controls 75 percent of the NFDM market), but it has already profited from the lower prices its misreporting has allowed it to enjoy; damages would at least partially cancel out this undeserved benefit.

### 3. Allowing Plaintiffs' claims to go forward would not unduly disrupt the Congressional pricing scheme embodied by the AMAA.

Plaintiffs did not initiate this lawsuit to challenge the agency's authority to set minimum milk prices or to directly contest rates which the USDA in its expertise has continued to treat as being correct and/or valid. Rather, it was only *after* the USDA concluded that DairyAmerica's misreporting had contaminated the minimum price setting process that this action was filed. Consequently, this case does not involve a scenario where a litigant is seeking to have a court substitute its evaluation of a proper rate for the agency's determination. This lawsuit does not constitute a disruption of the Congressional pricing scheme embodied in the AMAA. As we observed in *Gallo*, "[m]isreported rates and rates reported for fictitious transactions are not [agency]-approved rates, and barring claims that such fictitious transactions damaged purchasers in the natural gas market would not further the purpose of the filed rate doctrine." 503 F.3d at 1045.

Moreover, the rate scheme here differs from typical filed rates. While Congress undoubtedly intended the FMMOs' minimum prices to apply in a uniform way within the monthly periods and the geographic areas, there is no indication of an overarching congressional or agency intent for uniformity on a nationwide scale, for a long period of time, or even in terms of the actual price paid, given that the FMMO merely sets a floor price.

The facts of this case, therefore, do not justify applying the filed rate doctrine preemptively. The district court would not need to second-guess agency decision-making or speculate about what the agency would have done in order to assess liability or calculate damages. To hold otherwise would be an exercise of mechanical formalism in contravention of the purposes of both the AMAA/DMEA and the filed rate doctrine itself.

## CONCLUSION

The district court properly determined that the filed rate doctrine applies to the AMAA minimum milk pricing program, but erred by concluding that the doctrine applies to bar the plaintiffs' state-law claims in this case. The judgment of the district court dismissing the case is therefore reversed.

**REVERSED AND REMANDED.**

_____

FISHER, Circuit Judge, concurring in the judgment:

I agree with the majority that the USDA's minimum prices for raw milk are subject to the filed rate doctrine. I

also agree with the majority that, based on the allegations in the complaint and the handful of documents properly included within the Rule 12(b)(6) record, the plaintiffs have *adequately alleged* the USDA's rejection of the FMMO prices. I would vacate the dismissal of the plaintiffs' claims because, assuming the facts are as alleged, the filed rate doctrine does not apply in this case.

I part company, however, with the majority's conclusion that the plaintiffs have *proven* the USDA's rejection of the FMMO prices. The majority errs by resolving disputed factual questions and making conclusive factual findings on a Rule 12(b)(6) motion to dismiss. DairyAmerica contends in its petition for rehearing that, if given the opportunity to conduct discovery, it would produce evidence to show that the USDA did not, in fact, reject the FMMO prices. Pet. 12. DairyAmerica has the right to make that showing. Accordingly, I would hold only that the plaintiffs have adequately alleged the USDA's rejection of the FMMO prices. I would not foreclose DairyAmerica from proving, on a full evidentiary record, that the plaintiffs' factual allegations are untrue.